Robert Grexford, Federal Defenders of San Diego, for Mr. Roberto Valdes. It is afternoon. Okay, thank you. This panel has the opportunity to decide three issues of first impression in this circuit. That always makes us nervous. Myself as well. This panel should hold that random warnings must be given to an individual who has been physically stopped by a loan agent, thrown to the ground, handcuffed, and then interrogated in a remote location. In essence, this panel has the opportunity... After he fled, you mean? Yes. Threw him to the ground after the guy ran away? Yes. Okay. This panel has the opportunity to determine where Glendo Gallego's ends and Barone Perez begins. This panel should also hold that a document prepared by a government agent at the request of another government agent for the express purpose of replacing live testimony in a criminal proceeding is testimonial under Trafford v. Washington. This panel also has the opportunity to clarify what elements the government must prove in a prosecution for illegal reentry under 8 U.S.C. 1326, an issue that recurs repeatedly within the Southern District of California. If I may turn first to the Miranda issue. The undisputed facts in this case is that Agent Mordlow, a uniformed Boulder Patrol officer, chased Mr. Cervantes up a mountain for about three-quarters miles for about three or five minutes and tackled him, threw him to the ground, either tackled him or, as Agent Mordlow put it, armbarred him. The agent held Mr. Cervantes on the ground, handcuffed him, and after that asked him questions, interrogated him, to which Mr. Cervantes gave incriminating responses. What was the scope and duration of that interrogation? The interrogation included what Mr. Cervantes' name was and, in particular, his national origin. Anything beyond that? I do not believe so. Didn't he get asked at some point whether he was injured or something? Or was that when he was first spotted? He was covered partly in ash, wasn't he, in this wildfire situation? No, Your Honor. I believe that's another federal defender's case. I'm sorry. Okay, never mind. Oh, yes, no, I'm sorry. Go ahead. This incident, where Mr. Cervantes had been tackled, held onto the ground, and handcuffed, occurred about 45 miles north of the United States-Mexico border. And as I said, it occurred about three-fourths of a mile away from Highway 78 in what Agent Mordlow described as, quote, rough desert terrain. It's this fact, the fact that Agent Mordlow was in this rough desert terrain alone with Mr. Cervantes is what takes Mr. Cervantes' case outside the scope of Galindo-Gallegos. In Galindo-Gallegos, this court held that 20 to 25 people were not in custody for purposes of Miranda specifically because there were so many people there. There were 20 to 25 suspects and only two agents. And this court held that the amount of people, the amount of suspects that were there decreased the possibility that officers may engage in coercive activities. That made it more public, more akin to a traffic stop that occurs on a public street, as in the case in Berkmer. And that is why this court did not find custody in Galindo-Gallegos. This situation, by contrast, Mr. Cervantes' situation, is exactly the concerns the Galindo-Gallegos court said were not present in the situation they faced. He is alone. He is alone with a uniformed Border Patrol agent. Not only is he alone with this agent, he's in a rough desert terrain, three-quarters of a mile away from a public throughway. He knows that he's alone. He's been tackled, thrown to the ground, held to the ground, handcuffed, and then interrogated. Under these circumstances, any reasonable person would have believed that they were not free to leave after brief questioning. Custody triggering. Well, we know he can be asked his name, right? Yes. So it just really comes down to his nationality. His nationality, yes, Your Honor. And how long, again, did this episode take before that incriminating evidence came out? I believe the testimony at trial by Agent Wardlow was that he took some time to catch his breath. How long that period of time was, I do not recollect if there was a specific time put at trial through Agent Wardlow. What's the outside limit, do we know? I don't think he gave an outside limit. I believe the quote was, I took time to catch my breath, asked him his name, his citizenship, and whether he was in the country legally. Okay. All right. If I may, I'd like to turn now to the Certificate of Non-Existence of Rector. It's colloquially known as the CNER. This is the document that the government introduced into evidence to prove, in an attempt to prove that Mr. Cervantes did not have permission from the Attorney General to reapply for admission to the United States. And at issue here is really whether Mr. Cervantes' Confrontation Clause rights were violated by the government introducing into evidence a document prepared by a government agent at the request of another agent, who in turn was requested by a government prosecutor, for the express purpose of replacing live testimony in a trial that was already anticipated when the request was made. And already a request that was made to prove an element of a criminal charge that was already leveled at Mr. Cervantes when the request was made. Under Crawford v. Washington, testimonial evidence that's introduced in the trial cannot be introduced unless the government has a showing of unavailability of the declarant and there's been a prior opportunity to cross-examine. There's no dispute here that there was any showing of unavailability of the declarant, in this case, Ruth Jones, nor was there any prior opportunity for Mr. Cervantes to cross-examine Ruth Jones. So the issue really comes down to whether the CNER is testimonial. And under the facts I just described, which are undisputed and supported by the government's own witnesses, it is clearly testimonial. It's testimonial, it's not only testimonial in the three hypothetical, or three possible definitions of testimony that the Crawford court put forward, it's testimonial under the definition of testimonial that Crawford put forward. At a minimum, Crawford said, testimony applies to, and as Crawford was addressing, police interrogation. This is police interrogation. Agent Bordelot testified at trial that a Border Patrol agent before him requested this document. He's, in essence, an agent. A police officer requested a document from another agent. There's no difference between that and a police officer asking another police officer a question and then attempting to introduce into evidence that other officer's response. Let's assume that we concluded it was testimonial and, therefore, unconstitutional hearsay. Is there a harmless error analysis we would then go to? There is a harmless error analysis for claims under the Confrontation Clause. The government would have to prove that the error was harmless beyond a reasonable doubt. Why isn't it harmless in this case? The first point is the certificate of nonexistence record was put into evidence to meet the government's burden of showing that Mr. Cervantes did not receive permission to reapply for admission by the Attorney General. The only other evidence in this record that goes to that element of the crime are the two statements made by Mr. Cervantes. The first statement should have been suppressed. Colloquially known as the field statement should have been suppressed. They shouldn't have been in evidence anyway. The second statement, the post-Miranda statements, were thrown into question at trial. Defense counsel at trial, when cross-examining Agent Weiss, put into dispute whether there was a language problem between Agent Weiss and Mr. Cervantes. I think that undermines any reliability that this panel can have in concluding that the post-Miranda statements on whether he had permission to reapply from the Attorney General undermines this panel's ability to do that. In addition to the CNER, you have statements that should have been suppressed, the field statements, and then you have statements whose reliability were not only questioned on cross-examination, but at trial were argued in closing evidence as unreliable because of this potential language dispute between Agent Weiss and Mr. Cervantes. And on the reentry itself as opposed to the failure to request, was it harmless as to that as well? I'm sorry? Well, you had to prove, they proved two elements, right? One is that he reentered and the other is that he didn't ask permission of the, or are you just saying it's all part of one? He was, in particular on the CNER, was only used to show that he had not received permission. Not received permission. That's all they put it in for? All the element that CNER went to. Okay. And I believe the language of the CNER, which provides that someone did a diligent search to see if permission was granted. Right. That's fine. Okay. If I could turn now to the jury instruction, the error that the district court made in instructing the jury. The court's instruction for the fourth element of Section 1326, the court instructed the jury that the government had to prove that Mr. Cervantes was found in the United States without the consent of the Attorney General of the United States. That instruction doesn't track the language of the statute. The statute criminalizes people who enter, found in, or attempt to enter the United States without the permission of the Attorney General to reapply for admission to come to the United States. Those are two different concepts. The instruction also doesn't track the language of the indictment. As defense counsel raised at trial, the indictment reads, quote, without the Attorney General of the United States having expressly consented to the defendant's reapplication for admission. Again, the court's instruction is in conflict with that. The court's instruction is also in conflict with the government's own brief where they list the elements of the crime at page 32. Admission under the immigration law is a lawful entry into the United States. Entry is just a simple physical entry into the United States. That can be a lawful admission with inspection, a lawful entry with inspection, or it can be an entry without inspection. A person here in the United States that has not been admitted is an applicant for admission. It's a very different thing. The statute itself uses the term enter and reapply for admission to enter. That in itself, I think, underscores that these are two different concepts that Congress was attempting to address, two different things when they wrote Section 1326. The rationale for this makes sense. Criminalizing not the entry itself, but the entry without reapplying for admission from the Attorney General, Congress could rationally determine that certain people who have committed certain crimes pose a risk to the United States that other people do not. Congress could set out various presumptions based on that person's criminal record. That presumption will last for five years, 10 years, 20 years, or life. In the excerpt of record at 235, you will see what's generally known as the warning to alien that sets out those time limits based on that person's actions before. Having rationally concluded that there are certain presumptions of a greater risk, after that presumption is gone, that person would just return to the exact same position that any other citizen of the world returns to. They don't need to ask for permission to reapply for admission. They can just ask to be admitted. It's sort of a double check on people that are presumed to be more of a threat to the United States than others. Once that presumption disappears, that person is in the same situation. If they enter the United States without inspection, they're still here illegally. They could definitely be prosecuted under 8 U.S.C. Section 1325. They just haven't violated 1326 that provides enhanced penalties for coming to the United States without first asking the Attorney General's consent to reapply for admission. There is no evidence in this record that the government put into evidence that Mr. Cervantes had not asked or received permission to reapply for admission, as opposed to permission to enter. They focused their entire argument on permission to enter. Those were the three issues I wanted to focus on here. I would like to say one thing on the sentencing issue. I understand that this Court does want to wait for the on-box decision to analyze. I would like to note, however, that although Judge Whalen sentenced Mr. Cervantes to the high end of his then mandatory sentencing range at the district court level, I think remand is appropriate in this case, precisely because Judge Whalen denied Mr. Cervantes a guideline departure based on imperfect necessity or a lesser harm departure. At the same time, there were two policy statements in the guidelines that were then mandatory, specifically 5H1.3 and 5H1.4 that essentially told Judge Whalen that he should not take into account Mr. Cervantes' mental and emotional condition nor his physical condition. Under 5H1.4, the physical condition is ordinarily not relevant. As this Court knows, there were serious issues about Mr. Cervantes' health and his state of mind at the time. Although Judge Whalen sentenced Mr. Cervantes to the high end, it all depends where you start. As the district judge stated at the beginning of the sentencing, his general practice was to start at the mid-range of the sentencing guideline and work from there after trial. Having decided that Mr. Cervantes was not entitled to an imperfect necessity departure, the mandatory nature of the guidelines, these policy statements, did not allow Judge Whalen to take into account what were truly mitigating facts in this case, Mr. Cervantes' physical health and also emotional. Counsel, why do we have Ameline error here, or why should we hold this for Ameline when the enhancement was based on his prior conviction? We've held that if you have a prior conviction, then, that you do not have to, the government does not have, we don't have to have a jury find that you had a prior conviction. Yes, I think this Court's precedent in that regard has been seriously undermined by intervening Supreme Court precedent. Well, the Quintana, Quintana case is pretty recent. It's 2004. It is post-Blakely. I agree, Your Honor. I believe it's pre-Shepard, and I think Shepard talks to how narrow Almendare's course needs to be confined. Why there is Blakely error is, I mean, I'm sorry, why Ameline error is, there's also an issue of whether the judge felt bound by the guidelines himself. If there is a plus 16, and if this Court finds that that's appropriate, that just starts Judge Whalen, as he put it. His practice was to start at the middle of the guideline range. On this record, thinking the guidelines were mandatory, as everyone was working under the assumption at the time Mr. Cervantes was sentenced, Judge Whalen could very easily not have felt able to, under a mandatory guideline sentencing regime, to take into account Mr. Cervantes' physical problems and the additional mental problems that come when people are facing their own mortality and the emotional traumas that come with that. That, I believe, is why there's Ameline error, Your Honor, because particularly with those policy statements, he would have felt bound not to take those factors into account. Post-Booker, those factors are obviously relevant under 3553A. And if I might reserve the remainder of my time. You may. Thank you. Thank you. Good afternoon, Your Honors. May it please the Court. Steven Stone on behalf of the United States. Unless you have some direct questions you'd like to ask, I would like to start by responding to the three areas which defense counsel discussed, which were the admissions at the time of the defendant's apprehension, the CNR, certificate of non-existence of record, as well as the elements of the offense. To start with the admissions at the time of the apprehension of the defendant, here you had a brief encounter. It was a Terry stop. The agent had reasonable suspicion. The agent chased the defendant who fled, used strong but reasonable measures to stop the defendant from fleeing, asked appropriate questions to either confirm or dispel the reasonable suspicion, and the reasonable suspicion was that the defendant was somebody in the United States illegally. Once those questions were asked, citizenship, how did you enter the United States to which the defendant responded illegally, at that point this became an arrest. Prior to that, as a district court found, it was merely a detention. And told otherwise, the purpose of a Terry stop, to confirm or dispel reasonable suspicion would be thwarted any time somebody flees. Because under the definition that the appellant is asking his court to find, it would always automatically be an arrest. But here, the Ninth Circuit has said, as we put our brief in U.S. v. Brook Booth, that strong but reasonable measures can be used. In Galindo, Gallego, the defendant ran, or was fleeing, was apprehended and brought back to the group. So the question there was whether that was reasonable or not. And those facts are different because the person was not questioned at the time they were stopped from fleeing, they were brought back to the group and then questioned. And in terms of this being public, I would just like to note that there's a difference between being three-quarters of a mile near a highway and back at the station. And I think that's a distinction that can be made as well. But what's really telling is the concurring opinion in Galindo-Gallegos, where it's set forth that there is no per se rule that physical detention, conversion and investigatory stop is a custodial interrogation. And the case cited there is U.S. v. Batista, 684 F. 2nd, 1286. Also, the concurring opinion noted that the court, the Ninth Circuit, has approved of more significant restraints when somebody has fled. There's a difference under the case law where somebody cooperates versus where somebody doesn't cooperate. And there it's whether the means were reasonable or not. As outlined in the concurring opinion in Galindo-Gallegos, handcuffing can be reasonable. Having somebody lie down on the ground prone can be reasonable. Placing somebody in a vehicle even can be reasonable. And stopping, bringing somebody back is reasonable. And you can also physically move a suspect, and that can be reasonable, depending on the circumstances. And here are the circumstances where that defendant fled. He ran three-quarters of a mile. The agent yelled, stop. The defendant did not stop. Also, in Batista, the Ninth Circuit, this court points out that a brief but complete restriction of liberty does not make a detention an arrest. Also, once again, as I said, that the use of force when somebody's not cooperating, as set forth in U.S. v. Thompson, is reasonable as well. And finally, on this issue, the contrary result, as stated in U.S. v. Patterson, would leave agents powerless to perform their investigative functions with the cooperation of suspects, without the cooperation of suspects. And legally here, one point I would like to make, too, is the defense counsel didn't bring it up in oral argument, but in the papers that the defendant was hit three times. The district court found that testimony of the defendant not to be credible. And as far as Veran Penaz goes, that case is distinguishable from this case. There, the interrogation, the questioning, lasted between half an hour to an hour and a half. There, the suspect was accused of lying. He was confronted with false or misleading witness statements. Good guy, bad guy tactics were employed. And they also, the court stated, that they were taking advantage of the suspect's insecurities about his ailing status. They kept him separated from his coworkers in a remote, rural location. And they insisted on the truth until he told them what they saw. Those facts aren't here. Okay. I think, why don't you move on to the CNER. The argument regarding the CNER is quite simple. Looking at Crawford, what the court looked at was certain exceptions. This is clearly testimonial, isn't it? I mean, how can you get around it? That's sort of an open issue, Your Honor. Justice Scalia certainly tried to set enough to make it. We talked about what the core group of testimony was. And a document such as this wasn't in that group. I mean, you're not even proffering this as a business record, right? No. But the argument here is simply that there were exceptions under common law. One was for the certificate of authenticity. And this document, like a certificate of authenticity, would have been admitted to common law. It wasn't used in common law because of, as Wigmore pointed out, rule of completeness problems, not confrontation problems. Thus, the founders didn't look at a document such as this. Well, here you have basically a hearsay document that comes in to say, well, for purposes of this litigation, we've gone and checked our records and we don't find anything. Therefore, one infers from that, from our search of the files and failure to find, that he didn't apply for readmission. That's classic hearsay. And the quality of the search that was made certainly would be subject to cross-examination if the declarant were present in court, right? Well, here the document simply states, it doesn't make that inference that he didn't have permission, it simply states that the records were checked. And then there's no record there. That's if the search was adequate. Well, I'd say there's a difference between that document saying that there was a search done, there are no records, versus a search was done, he didn't have permission. That's a different situation. It's offered as evidence that he didn't have permission, right? That's correct. Okay, so it's offered for the truth of that assertion, circumstantial as it may be. So if, in fact, I could cross-examine the declarant and find out that there's a whole section of the files that are not up to date or that they have a backlog or that the communication between the border agents and the central office are imperfect, I could cross-examine that person, correct? Your Honor, I'd say no. Why not? I'd say under the United States v. Rodriguez, Rodriguez, such examination in a case such as this, where there had been no proffer that an application was filed, is not allowed. This circuit is ruled on that issue in Rodriguez, Rodriguez, where the custodian was going to be questioned about bad record keeping of INS, which ironically happened in this case anyway, and other record keeping methods regarding the A file. But the lesson we learned from that case is that, absent some sort of proffer that there is an application, it's irrelevant. And here, no such proffer was made. And so here, defense counsel was able, in cross-examination of the custodian, which obviously is not the same as the person who conducted the record search, but was able to go into areas which they wouldn't be allowed to go into. And so even if Ruth Jones had been subpoenaed and had come out to testify, absent a proffer under the current state of Ninth Circuit law, that testimony or that cross-examination should not be allowed. Counsel, if you – I understand your argument about the proffer, about putting it in sort of contesting the fact of whether you've got it there or not. But looking at your citations to Wigmore and going back and read Crawford last night, you're stuck, aren't you? This is not a business record. Wigmore clearly supports Justice Scalia's point that this was not within any common law exception in 1791, and you're stuck here, aren't you? Your Honor, well, first of all, we sent out a 28-J letter regarding the Fifth Circuit's opinion where I think they – the Fifth Circuit's opinion was 2005, and under Scalia's opinion in Crawford, it seems to me you need evidence from 1791. Well, in there – and I think in our letter we said they're making the business record – that they made the business record's argument or that's what the basis of that opinion was. And we're not adopting that. I've made that clear. But here there were exceptions. I think Scalia – Justice Scalia does say that exceptions of common law would apply. Okay. But I understood – I understood that Wigmore said that it was not an exception, which he thought was one of the most stupid instances of legal pedantry in our annals. That's correct. That was based on the rule of completeness, not the confrontational aspect of the document. And there's a difference there. They didn't want it in for reasons that wouldn't have concerned the founders regarding Confrontation Clause problems. So when the Confrontation Clause was drafted, they had in mind that a document such as this would not be allowed because of confrontation problems. At the time it wasn't used because of rule of completeness problems, which Wigmore criticized as being one of the most stupid decisions. I forget the exact language he uses, but – That's why some people don't buy originalist theory. They don't get bound by these stupid decisions. Your Honor, I'm bound by the Supreme Court. But so I think there – but to answer your question, I think there's a difference there in that this document was not precluded because of confrontational reasons, because of the reasons that the founders would have precluded such a document. So you're saying it only goes to reliability? Or what? In terms of the rule of completeness argument or – I don't know what you say. It's not confrontation. I mean, why was – Well, the documents that were allowed under the Confrontation Clause, my reading of Crawford said Justice Scalia would allow documents which the founders had no problem with allowing evidence on confrontational grounds for those reasons. And here, like a certificate of authentication, a certificate of no records would have been allowed. Absent, the only reason it wasn't used in common law was because of rule of completeness problems, not because of hearsay, testimonial concerns. To address your earlier concerns about harmless error, we believe that if the court decides that the CNR should not have come into evidence, that it would be harmless error beyond a reasonable doubt. And the evidence in the record shows that there was testimony at page 295 of the Supplemental Excerpts of Record that talked about a review of the A file having taken place and that there was nothing found in the A file showing an application had been made or a permission had been given, and that's the place where it should have been. You have the statements of the defendant, first at the time of his apprehension that he was not in the U.S. legally, and post-Miranda that he did not receive permission from the Attorney General to be entered. You have the circumstances of his apprehension, somebody running from a Border Patrol agent, circumstantial evidence that that person didn't have permission to be in the United States legally. At the time of his post-Miranda statement, or when he's back at the station, he initially lied about his name. Once again, circumstantial evidence that he did not have permission to be in the United States legally. Defendants stated in the reply brief, repelling, excuse me, that there was no evidence about distinct markings of a Border Patrol vehicle at trial, and that's wrong. At page 156 of the supplemental excerpts of records, those facts were explored on direct examination. With that, and the final thing that was brought up when appellant counsel was up here, was the language issue about speaking English or not. I can't recall whether it was at the suppression hearing or at trial, but there was a transcript offered from a prior plea call with this defendant where he clearly stated he spoke English. So none of the concerns about language barrier did exist. If you have no further questions about this issue, I will address the elements of the offense. Please. Here the court did not discuss permission to reenter. That's not the jury instruction in this case. The court instructed the jury that the defendant was found in the United States without the consent of the Attorney General of the United States. This instruction is broad enough to include consent to reapply for admission into the United States. It just didn't have that additional language. Also, defendant's interpretation could also lead to absurd results where somebody can't be prosecuted for a 1326 case. It could be in the U.S. illegally while an application is pending. Well, there's a lot more to that. Somebody would have to be paroled in. In that case, 1326 action, that would be a defense. What's interesting is that in the proposed jury instruction, the defendant or, excuse me, appellant argued that the Immigration and Naturalization Service had not expressly consented to defendant's reapplying for admission. Thus, the very jury instruction submitted by appellant on its face didn't follow the language of the statute. Well, let's see. It's closer than yours. It says the Attorney General has expressly consented to such aliens reapplying for admission. That's what the statute says, right? Correct. And there it says INS, agent of the Attorney General, has not expressly consented to the defendant's reapplying for admission.  So I think they're kind of being inconsistent here when they say, hey, we're following the language of the statute. What is the difference between what? What's the difference? Well, see, I would have no problem with the language at that time, Immigration and Naturalization Service, because that was under the Department of Justice, under the Attorney General. That's who would look at a claim, look at an application here, the INS, not John Ashcroft. Yeah. And that changed later on, but not before this case came about. So what's your point, then? My point is, is that they're wanting to hold, that they're wanting instruction that is exactly like the language of the statute. And they themselves are willing to take liberty. Well, wait, wait, wait, wait, now. Now, let's not over-argue. What is the liberty they took there? Well, you went off on this detour on INS, but admitting it's irrelevant because at the time INS was part of the DOJ and therefore under the AG. Well. So what is it, what's the liberty they took here? Or what they wanted to take was having INS instead of the Attorney General. That's it? Yes. This is part of a larger point, Your Honor, which is that the instruction was without the consent of the Attorney General of the United States. That's what the judge actually gave. And they're saying, well, you have to have the language. I see. And it was, were you the trial counsel on this, the prosecutor on this? Yes, Your Honor. And did you object to this on the basis that it said INS and not the Attorney General? Your Honor, we agreed with the model, the Ninth Circuit model instructions, which have been upheld in two cases cited in our brief, U.S. v. Medina and U.S. v. Jimenez-Forja. They were modified for a founding case. And it was that language that the court used when it came up with the instructions. So we didn't object to the court's instruction based on that because it was following the model instructions supported by case law. And as we put in our brief, all the cases refer to this as simply being without consent of the Attorney General. They don't add that additional language about reapplying for admission. And there's nothing to say that, well, you have to have a form of consent one way or another here. And so whether it's, and so the consent to reapply is covered by that instruction. And also it was sort of interesting in preparation for this, I read back through Almodores-Torres, and in that case the Supreme Court sets forth the language of 8 U.S.C. 1326. And what's interesting is when they get to this portion, the consent portion of the statute, they put it in brackets and they talk about without consent of the Attorney General or, I forget the exact ones, or other legal alternatives. So based on that, I agree with the district court with the instruction they gave. I believe it was appropriate. I believe it's still appropriate. I believe it correctly states the law. Also- Counsel mentioned that there are higher penalties if you're under 1326 than if you're, what is it, under 1325? There's different statutes. Under 1325, you don't have the element of deportation. 1326, you have the element of deportation. Plus in 1326B, if you suffered an aggravated felony, the statutory maximum goes up to 20 years. One other point made by appellant is the use of immigration law terms. And a similar argument in terms of you trying to use immigration law terms to look at the elements of 8 U.S.C. 1326 offense was attempted in Rivera-Silas where they looked at the definition of entry and the three different definitions of an entry, and that notion was rejected. So this Court has not been using exclusively immigration definitions when interpreting 8 U.S.C. 1326. And one last point was that in closing argument, appellant's counsel actually argued to the jury what they would like to have the instruction be, which is about the reapplying for permission to be in the United States. Okay. With that- On the sentencing issue, do you agree that there is some question as to whether the district court may have approached this case differently had it known that the guidelines and policy statements were discretionary, not mandatory? No, Your Honor, and we submitted a letter on that point. There was no departure motion made for a mental, emotional, or physical condition departure. None of those were made. There were two departures which were lesser harm and imperfect necessity, both of which were denied. The Court had the discretion under the guidelines to go the high end, low end. The Court went to the high end. The Court also considered the 3553 factors which would be required to do so now. It looked at the PSR, which went through the history of this defendant and noted the defendant's lengthy state criminal record, the fact that this was his third conviction for 8 U.S.C. 1326, and the fact that the defendant waited nearly days before being deported following his last offense and then returning illegally to the United States. So we don't think that the third or fourth crimes of the harmless error analysis have been met by the defendant in this case. If there are any other questions, I would gladly answer them. I think we have your case in mind. Thank you. If I could first briefly touch on the CNER and the harmlessness. Mr. Stone mentioned that there's a colloquy, a plea colloquy from 1994, where it's apparent that Mr. Cervantes speaks English. I don't think that's a completely accurate statement. First of all, although the colloquy, a portion of it, was in front of the jury at the very beginning of the testimony, I don't have the excerpt of the record. It was only on whether he was a citizen of Mexico. The issue of whether he spoke English, I believe, was outside the presence of the jury and only in front of the court. And the only evidence that came in was that in making Mr. Cervantes' counsel, while making his appearance, didn't say Mr. Cervantes is being helped by the court interpreter. Sometimes that happens or not. On the CNER, I believe it is testimonial. I would just point to Crawford at page 56, note 7, where the majority says that involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse, an abuse the framers were quite aware of. I think the CNER is clearly testimonial. On the issue of the jury instruction on consent being broad enough to encompass the defense's theory of defense and the statutory language and what the element of 1326 actually is, while it's true that this court said found without the consent of the attorney general, during closing argument was the only time that that was raised. Mr. Stone is absolutely correct. Defense counsel at trial was able to articulate that. Unfortunately, there was no jury instruction to back her up, and the jury was instructed that argument of counsel isn't the law. The only bit that the jury had on this point, what was actually the law, happened during the government's closing. And this is at the second volume of the supplemental excerpt of record at 353 to 354, where the government said in closing that they had to prove that he hadn't applied for admission. Mr. Cervantes' counsel objects as a misstatement of the law, and that objection is overruled. The only statement on the law, the only affirmative statement that the judge made, was overruling the defense objection on the very point that government now says we had an opportunity to argue in closing. I do want to say one quick thing on the strong, reasonable measure lines of cases that the government cites. Those are all distinguishable, primarily because they all happened in public. The vast majority of them found a constitutional violation, and there were serious issues of officer safety in the sense of reports of armed robberies, guns being present, shots being fired. More specifically, the defense position will not floor law enforcement. If you have enough suspicion to chase a man up a hill, throw him to the ground, hold him there, and handcuff him, you have enough suspicion to Mirandize him. That's what Mr. Cervantes is saying. Thank you. Okay. Thank you both. Thank you for the argument. That concludes our calendar for the day. We will stand in recess until tomorrow. This case is submitted. Thank you. Okay. You may go. Don't have time for me. Could you do that? Yeah. Maybe you could. Thank you.
judges: Browning, Fisher, Bybee